IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


ESMEREGILDO M. ALMAGER

      Petitioner,

v.                                   CIV 11-0162 JCH/KBM

ERASMO BRAVO, Warden, and
GARY K. KING, Attorney General
for the State of New Mexico,

      Respondent.


# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

      THIS MATTER is before the Court on Esmeregildo Almager's *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case.  *E.g., Abdul-Kabir v. Quarterman,* 550 U.S. 233, 246 (2007); *DeLozier v. Sirmons,* 531 F.3d 1306, 1319 (10th Cir. 2008), *cert. denied,* 129 S. Ct. 2058 (2009).  All of the issues can be resolved on the record before me and, therefore, an evidentiary hearing is unnecessary.  *E.g., Schriro v. Landrigan,* 550 U.S. 465, 474 (2007); *Hooks v. Workman,* 606 F.3d 715, 730-31 (2010); *Alverson v. Workman,* 595 F.3d 1142, 1164 (10th Cir. 2010), *cert. denied,* 131 S. Ct. 512

(2010); Rule 8(a), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS. Because no evidentiary hearing is necessary, Petitioner's motion for appointment of counsel should be denied. *See Swazo v. Wyoming Dept. of Corrections,* 23 F.3d 332, 333 (10th Cir. 1994) (no constitutional right to counsel in habeas proceeding; appointment of counsel only mandatory when evidentiary hearing required); Rule 8(c), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS (if "evidentiary hearing is warranted, the judge must appoint an attorney to represent a petitioner").

## I.  Overview

Among other things, a jury convicted Petitioner of aggravated burglary, battery, and assault, but acquitted Petitioner of contributing to the delinquency of a minor. Because of his status as a habitual offender, the trial judge sentenced Petitioner to consecutive sentences amounting to more than seventy years of incarceration. The burglary occurred at the home of Petitioner's former employers, who produced jewelry in a building near their home. They also employed Linda Gurule, whose minor daughter "Tiffany" lived with her. After Petitioner separated from his wife and children, he began a sexual relationship with Tiffany and moved into the Gurule home.

At trial, one of the employers testified that he recognized the voice of one of the two masked burglars as Petitioner's. The other employer testified that she recognized the two burglars as Petitioner and Tiffany from their general appearance and eyes. Tiffany testified that the idea for the burglary originated with Petitioner and that she assisted him. Her testimony about the details of the crime was generally consistent with the employers' testimony.

Petitioner testified that he was not present at the burglary, and that Tiffany likely committed the crime with her brother Michael. Petitioner stated he only became involved after

the burglary, in order to take the blame for Tiffany.  *See, e.g., Doc. 1* at 1; *Doc. 10* at 3; *Doc. 10-1* at 1-3, 12-20.[1]  The jury obviously disbelieved Petitioner and found him guilty beyond a reasonable doubt.

Petitioner exhausted his state remedies by pursuing a counseled direct appeal and pro se state habeas relief through the New Mexico Supreme Court.[2]  Almager raises four claims in his federal petition.  One claim, raised on direct appeal, is whether his conviction for two counts of aggravated assault constitute "unitary conduct because it occurred in a single incident on a single evening . . . from a single person a single act."  *Doc. 1* at 10.  The remaining three claims relate to exclusion of entries Tiffany had made on her "MySpace" pages,[3] where she portrayed herself as embracing a "gangsta" lifestyle.[4]  On direct appeal, counsel asserted that the "trial court's" decision to "exclude" Tiffany's MySpace pages was erroneous as an error of state evidentiary law and as a violation of the federal and state constitutional guarantees to confrontation.  *See,*

---

[1] Unless otherwise noted, all citations are to CM/ECF pagination, and not the internal pagination of the exhibit.

[2] In addition to arguing the federal claims are without merit, Respondents make the twin assertions that the issues raised in the federal petition are exhausted, but that they do not waive any argument that exhaustion did not occur.  *See Doc. 10* at 8, ¶ 8 ("Respondents respond that Petitioner has, however imprecise and vague, exhausted the four claims raised in the Petition."); *id.* at 10, ¶ 12 ("however vague and imprecise the claims raised in the petition for writ of certiorari may have been, the New Mexico Supreme Court did review the allegations finding the grounds lacked merit and denying review"); *id.*, ¶ 13 ("Respondents do not expressly waive the exhaustion requirement.  28 U.S.C. § 2254(b)(3).  This Answer should not be interpreted in any way as an explicit and express waiver of the exhaustion requirement by Respondents.").  However, under these circumstances, Respondents have waived exhaustion.  *See, e.g., Richwine v. Romero,* 2011 WL 2066552 at **2-3 (10th Cir. 2011); *Soto v. Nance,* CIV 11-0449 BB/KBM (Doc. 11 at 6-8).

[3]  The official website spells the name "MySpace" as one word with irregular capitalization, so for consistency that is the convention I adopt here, even when a quoted source uses another format.

[4] Definition of GANGSTA.- 1. : a member of an urban street gang. 2. : a performer of gangsta rap. *See* www.merriam-webster.com/dictionary.

*e.g., Doc. 10-1* at 21, 24.  Petitioner reiterated these arguments in the post-conviction

proceedings as a matter of ineffective assistance of trial and appellate counsel, and explicitly

invoked the Confrontation Clause and federal cases such as *Crawford v. Washington, United*

*States v. Cronic,* and *Brady v. Maryland.  See, e.g., Doc. 10-2* at 49, 53, 50, 50-56; *Doc. 10-3* at

7-12, 18, 30, 36-41.

## II.  AEDPA Standards Of Review & Initial Matters

Recently in another case, I reviewed the primary AEDPA provisions governing federal

habeas review.  I incorporate that discussion herein by reference.  In general AEDPA applies to

any  "cognizable" claim that a state court denied "on the merits."  Thus, if a state court is

presented with a federal constitutional claim and denies it, as opposed to finding the claim

procedurally-defaulted, then AEDPA deference will apply regardless of whether that court

provided any reasons for its decision.  *See Gallegos v. Bravo,* CIV 10-372 JB/KBM (Doc. 15 at

12-14) (footnotes omitted) (discussing *Harrington v. Richter,* ___ U.S. ___, ___, 131 S. Ct. 770,

784 (2011)).

Deciding whether the AEDPA principles are applicable here is quite complicated because

the New Mexico Court of Appeals found the MySpace confrontation claim procedurally

defaulted for trial counsel's failure to raise the argument with the trial court.   Then, in the post-

conviction proceedings, the trial judge did not address the constitutional aspect of the claim at

all, thereby seeming to let the procedural default lie undisturbed.

I ordered the State to supplement its answer with materials from the state proceedings.

The State designates the audio recording as the "official record," primarily for fiscal reasons and

because it believes the audio recording is more accurate than typist transcriptions.  *See Doc. 12*

at 4-6.  The State understandably is reluctant to transcribe the recordings for federal habeas

review because the "onerous expense" far outweighs whatever convenience this Court will gain by having a written transcript.[5]  *See id.* at 6.  For efficiency and ease of review for the district judge and Tenth Circuit in the event of an appeal, this chambers made the unofficial transcriptions of the audiotaped record that appear throughout this recommendation and the attached Appendix.

The audiotapes of the actual proceedings having been reviewed in their entirety, I am aware of certain matters that appellate counsel and the New Mexico Court of Appeals overlooked on direct appeal when they only consulted the courtroom deputy's notes of the taped proceedings.  Those notes obviously do not reflect everything that transpired or necessarily reveal the context of noted items.  Also, the Court Of Appeals did not mention the portions of the courtroom deputy's notes that would have alerted it to the confrontation issue having been raised pretrial, where the tapes reveal the trial judge recognized confrontation as an important issue in connection with potential exculpatory or impeachment value of Tiffany's psychological report, which he reviewed in camera.

Before opening statements, the issue of the defense's use of the MySpace pages arose in the context of the State's motion in limine.  After considerable discussion, which was not confined to the "contributing to the delinquency of a minor" context that was key to the Court of Appeals' decision, the trial judge ruled that the defense could use the MySpace pages for

---

[5]   This is to be distinguished from transcripts on direct appeal, where Supreme Court authority has "settled that if a state provides transcripts for appeals from convictions in criminal cases, the due process and equal protection clauses of the Fourteenth Amendment require that the right shall not be limited to those who are able to afford the expense of an appeal;" although a "record of sufficient completeness" does not necessarily require a "complete verbatim transcript," some circumstances may so require. *Heinemann v. Murphy,* 326 F. App'x 455, 462-63 & n.3 (10th Cir. 2009); *see also Harris v. Champion,* 15 F.3d 1538, 1558 (10th Cir. 1994) ("that either an indigent defendant be provided a free transcript or some equivalent method of reporting the trial proceedings be employed").

impeachment purposes if Tiffany testified inconsistently with prior statements.  The trial judge also ruled that the defense possibly could use the pages used for other purposes, so long as defense counsel received prior permission from the trial judge after approaching the bench at a sidebar.[6]  Unfortunately, some of the bench conferences where defense counsel likely would have made such motions critical to the analysis here are whispered and inaudible, even with all of the enhancing techniques available to this Court through the software and hardware used to listen to the recordings.

There is authority, including in this Circuit, that when portions of the state record are missing due to no fault of the defendant, no AEDPA deference is due "because judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." *Winston v. Kelly,* 592 F.3d 535, 555-56 (4th Cir. 2010).[7]  Among other decisions, *Winston* cites *Wilson v. Workman,* 577 F.3d 1284 (10th Cir. 2009).  The Tenth Circuit decision in *Wilson* reasons as follows:

> the "exhaustion" and "adjudicated on the merits" elements of federal habeas practice are mirror images.  To satisfy the exhaustion requirement, a prisoner must afford the state court the "opportunity to apply controlling legal principles to the facts bearing upon [his] constitutional claim," . . . which entails presentation both of the facts on which he bases his claim and the constitutional claim itself. . . . To be entitled to deference under AEDPA, the state court must similarly decide

---

[6]  Trial counsel located Tiffany's MySpace pages for these federal proceedings, and Respondents filed those materials under seal.  In a cover letter, counsel states that the pages are those the defense "tried to offer" and "tendered" at trial.  *See Docs. 13, 13-1.*

[7]  *See also, e.g., Stewart v. Erwin,* 503 F.3d 488, 503-04 (6th Cir. 2007) ("it is quite clear that the State, rather than Stewart, must bear the burden of producing these materials for federal court review, and must suffer the consequences of any continued failure to do so. . . .  Consequently, if the State does not comply [and] supplement the record . . . then the district court is directed on remand to grant Stewart's petition for a writ of habeas corpus."); *compare Valdez v. Cockrell,* 274 F.3d 941, 954-56 (5th Cir. 2001) (state's inability to produce missing exhibits was not due to misconduct, and federal habeas court had "the necessary materials with which to review the state court proceedings" so AEDPA deference rather than de novo review applied).

the "substance" of the claim, which means to "apply controlling legal principles to the facts bearing upon [his] constitutional claim." . . .   **To dispose of a claim without considering the facts supporting it is not a decision on the merits.**

      Our interpretation comports with the general purposes and structure of **AEDPA** as well as its language.  While that statute vindicates goals such as federalism and comity by affording great deference to state court decisions, it **prescribes deference only for decisions the state court has actually made.  These purposes are not served when the state court has never considered the substance of the claim in the first place. . . .   As the federal court would be the first court "to apply controlling legal principles to the facts bearing upon [his] constitutional claim," . . . its ruling would show no disrespect to any contrary dispensation from the state court.**  AEDPA entitles a defendant to receive de novo review of his federal claim from *some* court, so long as he is diligent and timely in presenting his claim.  If the state court does not perform this review because it has limited its review to the trial record, and the federal court does not perform this review because it nonetheless defers to the state court's judgment, then de novo review will never be performed.

*Wilson,* 577 F.3d at 1292-93 (emphasis added).

      Both situations – not considering the actual facts reflected by the official record, and not

considering the Confrontation Clause claim at all in post-conviction proceedings – seem to be at

play here.  Furthermore, the procedural rule cited by the New Mexico Court of Appeals for its

waiver ruling does not foreclose preservation by raising an issue pretrial, and also contains an

exception for errors of "fundamental" dimension.[8]  The Tenth Circuit has ruled that this

---

[8]   The rule provides in full:

> **A. Preserving Questions for Review.**  To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked, but formal exceptions are not required, nor is it necessary to file a motion for a new trial to preserve questions for review.  Further, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party.
>
> **B. Exceptions.** This rule shall not preclude the appellate court from considering jurisdictional questions or, in its discretion, questions involving:
>     (1) general public interest; or
>     (2) fundamental error or fundamental rights of a party.

NM Rule 12-216 (Westlaw 2011).

exception precludes the rule from being deemed "adequate" for federal habeas procedural default purposes.[9]   Failure to argue that exception on direct appeal can also be the basis for an ineffectiveness claim that could excuse the procedural default, and Petitioner did raise the subject of ineffectiveness of both trial and appellate counsel in the post-conviction proceedings.[10]

Ultimately, whether the procedural default should be enforced or excused and whether trial or appellate counsel were ineffective rest on the determination whether Petitioner's Confrontation Clause and "*Brady*" arguments have any merit.[11]   All in all, it is simply easier to employ a de novo review of these claims, than to wade into the AEDPA morass presented by this case.  The claims are plainly baseless without or without AEDPA "deference."  *C.f., Sandoval v.*

---

[9]  "The question whether a state procedural rule is adequate is itself a question of federal law. . . .  The adequacy inquiry asks whether the state rule in question was firmly established and regularly followed." *Bunton v. Atherton,* 613 F.3d 973, 989 (10th Cir. 2010) (internal quotations, citations, and alterations omitted) (quoting *Beard v. Kindler,* ___ U.S. ___, ___, 130 S. Ct. 612, 617 (2009)); *see also Gutierrez v. Moriarty,* 922 F.2d 1464, 1469-70 (10th Cir. 1991) ("[New Mexico] courts have also often stated that they 'may exercise *discretion* to consider fundamental rights that may have been infringed without preservation of error.' . . .  Our research has discovered no case articulating the parameters within which the New Mexico courts exercise this discretion, and it appears that there are no standards governing those courts' discretionary review of cases raising defaulted fundamental constitutional rights absent fundamental error.  When assessing the adequacy of the New Mexico procedural bar rule, we must therefore recognize that the New Mexico state courts have expressly reserved their unfettered discretion to waive the rule.  This circumstance argues against the conclusion that the courts apply the rule regularly and evenhandedly."); *State v. Munoz,* 144 N.M. 350, 358, 187 P.3d 696, 704 (N.M. App. 2008) ("Defendant additionally argues that because he has raised an issue of a fundamental right, this Court should not apply the preservation restrictions of *Gomez* and Rule 12–216(A).  Rule 12–216(B)(2) allows this Court discretion to entertain unpreserved issues involving the fundamental rights of a party.")

[10]  *See, e.g., Edwards v. Carpenter,* 529 U.S. 446, 451–52 (2000) ("[I]neffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim . . . [and] . . . generally must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.") (internal quotations omitted)).

[11]  *See, e.g., Dennis v. Poppel,* 222 F.3d 1245, 1250 (10th Cir. 2000) ("In order to determine if prejudice occurred, we review the merits of Mr. Dennis' underlying or constitutional claims. . . .   If those claims lack merit, Mr. Dennis cannot claim prejudice from his attorney's failure to raise them at trial or on direct state appeal."); *Jones v. Gibson,* 206 F.3d 946, 959 (10th Cir. 2000) ("as discussed above, there is no merit to the confrontation claim, appellate counsel was not ineffective").

*Ulibarri,* 548 F.3d 902, 915 (10th Cir. 2008)  ("Under the circumstances, we will not decide this murky issue of procedural bar because the claim is easily defeated on the merits.").

### III.  Analysis

#### A.  Unitary Conduct

On direct appeal, the New Mexico Court of Appeals explained that the State charged Petitioner with one count of aggravated assault for "threatening" to shoot one of the victims and another count of aggravated assault for "actually shooting at" the other victim.  It rejected the argument that "all of the acts were 'unitary' under a double jeopardy analysis simply because they occurred in a single location on a single evening."  *Doc. 10-2* at 6-7.  It further rejected the argument that the burglary was "unitary" with the events that took place afterward in a motel room to conceal the crime.  *Id.* at 7.  On state habeas review, the trial judge construed Petitioner's double jeopardy claim as raising only his conduct at the motel after the burglary, and rejected it on the ground that "Defendant does not understand the principle of unitary conduct in double jeopardy analysis."  *Doc. 10-3* at 3.[12]  In the federal petition, Petitioner focuses solely on the "conduct in the home" and argues the conduct "was unitary because it occurred in a single incident on a single evening . . . from a single person a single act."  *Doc. 1* at 10.

The Double Jeopardy Clause does protect against multiple punishments for the same or "single" offense.  *See, e.g., North Carolina v. Pearce,* 395 U.S. 711, 717-18 (1969), *overruled on other grounds, Alabama v. Smith,* 490 U.S. 794 (1989).  The intent of the New Mexico

---

[12]  The trial judge considered the claim to be that "constitutional double jeopardy prohibitions should have prevented the State from prosecuting more than one crime at the scene of the burglary and more than one crime at the scene of the armed standoff with police."  *Doc. 10-3* at 3.  In fact, Petitioner raised the same two, and separate, arguments he raised on direct appeal:  a violation of double jeopardy because (1) "both counts of aggravated assault where the conduct from which the two . . . counts arose was unitary;" and (2) because the "conduct at the house was one unit of unitary conduct and that his acts at the motel were a separate event."  *Doc. 10-2* at 56; *see also id.* at 56-57.

legislature is "controlling" such that, "if the legislature provided for multiple offenses under the circumstances," then a habeas petitioner has "no premise for a double jeopardy claim." *Thomas v. Kerby,* 44 F.3d 884, 887 (10th Cir. 1995); *see also, e.g., Missouri v. Hunter,* 459 U.S. 359, 368-69 (1983) (when a state "legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct [the federal] court's task of statutory construction is at an end").  New Mexico's interpretation of that legislative intent is "binding" on this Court:

> "In assessing whether a state legislature intended to prescribe cumulative punishments for a single criminal incident, we are bound by a state court's determination of the legislature's intent." *Birr v. Shillinger,* 894 F.2d 1160, 1161 (10th Cir. 1990); *see also, e.g, Lucero v. Kerby,* 133 F.3d 1299, 1316 (10th Cir. 1998) (asserting that federal court in habeas corpus proceeding should defer to state court's determination of separate offenses for double jeopardy purposes), *cert. denied,* 523 U.S. 1110 (1998); *Thomas v. Kerby,* 44 F.3d 884, 887 (10th Cir. 1995) (same).  In other words, if the highest state court determines that the legislature intended to punish separate offenses cumulatively, a federal habeas court must defer to that conclusion.  *See Birr,* 894 F.2d at 1161.

*Cummings v. Evans,* 161 F.3d 610, 615 (10th Cir. 1998), *cert. denied,* 526 U.S. 1052 (1999); *see also, e.g.,  Missouri,* 459 U.S. at 368 ("the Missouri Supreme Court has recognized that the legislature intended that punishment for violations of the statutes be cumulative. We are bound to accept the Missouri court's construction of that State's statutes.");  *Aguilar-Ramos v. Medina,* 427 F. App'x 659, 660, 2011 WL 2489981 (10th Cir. 2011) ("Of course, a federal court is bound by the state court's interpretation of the second-degree kidnapping statute.") (citing *Missouri*).

    While the presence of multiple victims during a crime may not always give rise to "multiple offenses" for all crimes, the New Mexico Court of Appeals has held that the legislature does authorize multiple punishments for aggravated assault when a defendant points a gun at different victims.

Defendant contends that his convictions and sentences for two counts of aggravated assault stemming from his one act of pointing a shotgun at the two victims violates his rights under the double jeopardy clauses of the state and federal constitutions. . . .

   The Court in *Herron* indicated that multiple victims will likely give rise to multiple offenses. . . . Nonetheless, Defendant attempts to find comfort in our recent decision in . . . *Castañeda* . . . . In that case, we held that the defendant's driving while intoxicated with three unrestrained children in the car could amount to only one count of child abuse not resulting in death or great bodily harm . . . . [*Castañeda*] contrasted . . . *State v. House*, . . . in which the conduct on which the legislature focused was death, and therefore the killing of four people was four offenses of homicide by vehicle even though there was only one act of driving and one accident. . . .

   Defendant relies on *Castañeda* for the propositions that, had he been convicted of the batteries of the two victims, two counts would be legally supportable because there would be two separate harms, but having been convicted only of assault, only one count is supportable. Defendant's argument is premised on the idea that the assault statutes are designed to protect against the potential physical harm of a battery. We think that Defendant's premise misperceives the legislative intent behind the assault statutes. We stated in *State v. Cowden* . . . that the harm to the victim protected by the assault statutes was mental harm, *i.e.*, putting persons in fear, while the harm protected by the battery statutes was physical harm, i.e., physical injury to persons. Thus, there are distinct actual harms suffered by victims that are protected by each statute. ***The legislative focus of the assault statutes being the protection of victims from mental harm, it is therefore permissible without offending double jeopardy principles to convict and sentence a defendant for two counts of assault for pointing a gun at two persons at the same time.***

*State v. Roper*, 131 N.M. 189, 192-93, 34 P.3d 133, 136-37 (N.M. App.) (emphasis added) (internal citations omitted), *cert. granted,* 131 N.M. 363, 36 P.3d 953 (N.M. 2001), *and cert. quashed,* 131 N.M. 619, 41 P.3d 345 (N.M. 2002). Accordingly, Petitioner's double jeopardy claim is without merit.

### B.  MySpace Pages & Confrontation Clause & Effectiveness Of Counsel

   Petitioner's other three federal claims are interrelated. Claims two and three rest on the defense position that Petitioner was not present at the burglary, and that Tiffany instead committed the crime with her brother Michael. Petitioner asserts that Tiffany's MySpace pages

were "exculpatory" and would have supported that defense theory, as well as would have shown

Tiffany was "biased" and her statements to the contrary were "lies."

> Tiffany G. denied that it was her brother who committed the crime that the Defendant was charged with.  The MySpace entries would have revealed that Tiffany and her brother was in good standings – a fact in which she lied about under oath and the day of the crime it was Tiffany and her brother that was together and not the Defendant.
>
> * * * * *
>
> Tiffany G. had made numerous statements in court and out. Contrary statements, Print-outs of Tiffany's MySpace would reveal that Tiffany had a motive to lie – fabricate a story to show bias and untruthfulness.  It was Tiffany's brother who was her accomplice.  Defendant produc[ed] evidence impeaching Tiffany.  Was a denial of Confrontation and the Brady Rule.

*Doc. 1* at 7-8 (certain punctuation and grammar provided for clarity).  He also contends that trial

counsel was ineffective in this regard because he did not

> conduct proper investigation [which] precluded the proper functioning of the adversarial system.  Counsel failed to demand that sworn affidavits be admitted into trial.  Witness Tiffany G statements were contrary to statements she made on her on (sic) MySpace.  Counsel's failure to find other means to invoke his client's confrontation rights denied the Defendant his 6th Amend. U.S. Const. right to effective counsel.

*Id.* at 5 (same).

The trial judge denied state habeas relief, in part, because Petitioner did not "provide a

factual basis for the claim that [Tiffany's] MySpace page implicates her brother in the burglary."

*Doc. 10-3* at 2.  This Court's record contains the MySpace pages under seal, and I have reviewed

them in their entirety.  *See supra,* note 6.  The only references to Michael in the MySpace pages

were made by Tiffany herself.  In the background information section entitled "heroes" it states

in full:

> My brother Michael for surez.  He'z my backbone, and keeps me in line . . . ALWAYZ!  He'z gangsta and yeas he put me on the game!  He gots my back all

the time, he'd even fuck a girl up so I don't have to.  I wrote him constantly when he got sent up, so I gots hiz respect, which iz hard to get!

*Doc. 13-1* at 13.  This was the passage that counsel quoted to the trial judge in arguing for admission of the MySpace pages.  *See Appendix,* note 4.  Another initial entry, describing her "mood" in July 2006 as "numb," recounted the death of Tiffany's brother Billy.  In that context she noted in part that:

> I thank God every single day for my brother ~*Michael*~ . . .  I love him, and wouldn't think twice about taking a bullet for that gangsta.  Michael haz a lot of haterz, only because he's real, and if you disrespected him . . . game over for you!  I look up to him to the fullest! . . .  Even though I'm only 16, and he'z 27 now, it's like we help one another grow. . . .  I alwayz took hiz side, and stuck up for him to the fullest.  I know Michael would never turn hiz back to me, or give up on me, so I make sure I wouldn't ever do it either.  When he waz in prison I waz hiz dedicated writer, and he never forgets that . . . never will I put some fool before my hero Michael! . . . I put him before anybody in my life, and alwayz will forever, and ever, and ever alwayz!

*Doc. 13-1.*

The crime at issue occurred on December 23, 2006.  *See, e.g., Record Proper* at 2-3.  Significantly, none of the pictures, the content, or the handwritten notes on the MySpace pages identify the few persons with whom Tiffany had contact during November and December 2006 as her brother Michael.   Furthermore, the overall impression from the pages as a whole is simply that Tiffany and her friends speak in a cliquish manner, and some of the friends with whom she associates are tough talkers with a penchant for weapons and tattoos and the "gangsta" lifestyle.  *Id.*  The pages do not establish or even suggest Michael was Tiffany's partner to the exclusion of Petitioner and, thus, do not have the "favorable to the defense" and "exculpatory" value under *Brady* that Petitioner contends they have.  Therefore, any impact the pages may have made on the jurors is entirely speculative.  *See, e.g., Douglas v. Workman,* 560 F.3d 1156, 1174 (10th Cir. 2009) ("The standard of materiality for *Brady* claims . . . is met when

the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict . . . show a reasonable probability of a different result.") (internal quotations and citations omitted); *Leyja v. Parker,* 404 F. App'x 291, 296 (10th Cir. 2010) ("Because Leyja does not show this study could have furthered his defense, his claim of a *Brady* violation must fail.") (citing *Sandoval v. Ulibarri,* 548 F.3d 902, 915 (10th Cir. 2008), which rejected a *Brady* claim "where appellant's argument that a medical report would have been exculpatory was merely speculative).").

The impeachment value of the MySpace pages is a separate inquiry.  Impeachment evidence is subject to disclosure under *Brady,* but because the prosecution did not "suppress" the MySpace pages, the only issue here is the Confrontation Clause aspect of the claim.[13]  The State asserts that any "evidentiary issues regarding Tiffany's "MySpace" account are matters of state law and not "cognizable" in this habeas proceeding, thereby "barring" federal review.  *Doc. 10* at 13, ¶ 21.  Although, as a general matter, habeas relief will not lie for errors of state law, errors of state law rising to the level of a constitutional violation (such as under the Due Process Clause or the Confrontation Clause) are "cognizable" and redressable by appropriate habeas relief.  *E.g., Wilson v. Sirmons,* 536 F.3d 1064, 1101-02 (10th Cir. 2008); *Moore v. Marr,* 254 F.3d 1235, 1246 (10th Cir. 2001).

The Defense focused on Defendant's positions that:  he was not present during the robbery; Michael was present both prior to and immediately after the crime; Tiffany's three-hour

---

[13]  *See, e.g., United States v. Mullins,* 613 F.3d 1273, 1284, n.5 (10th Cir.) ("Ms. Mullins also frames the limitation on her cross-examination as a violation of her due process right to a fair trial.  She refers to the government's obligation under *Brady* . . .  *Brady*'s disclosure requirements and the right to cross-examination are, of course, integrally connected.  *See Nuckols v. Gibson,* 233 F.3d 1261, 1267 (10th Cir. 2000).  In the absence of any allegation that the government failed to disclose evidence, however, we think our Confrontation Clause precedent provides the proper rubric for assessing her claim.  *Cf. United States v. Atwell,* 766 F.2d 416, 421 (10th Cir. 1985).")*, cert. denied,* 131 S. Ct. 582 (2010).

statement to the police was a concoction to avoid a prison sentence of more than thirty years, to shield her brother from culpability, and to pin the blame on Defendant; Defendant intervened only after the burglary took place when Tiffany called him; and, he helped by trying to conceal evidence of the crime to protect Tiffany.

As reflected in the Appendix, prior to opening statements, the trial judge made his Rule 404(b) "character evidence" ruling that the MySpace pages were inadmissible to show Tiffany's "gangsta" or bad character, but could be used to impeach her if she made inconsistent statements.   The defense could also use the pages for any exception to the 404(b) rule provided it secured prior permission from the trial judge at a sidebar conference.  Just prior to cross-examination of Tiffany, the State moved to exclude any reference to the tattoos the jurors had not seen – those names of Petitioner and "Billy" on the back of her neck, and a gun in a holster on her inner thigh.  In that context, the trial judge reiterated his ruling that the defense could not introduce matters that simply constituted "gangsta" character evidence and disallowed the defense to show the tattoos otherwise not visible to the jurors.[14]  He would however, allow cross-examination on "conversations" with her brother Michael while he was tattooing Tiffany. *Audiotape of Trial 2/5/08* at 9:11:50 – 9:17:00.

In denying habeas relief, the trial judge noted that Tiffany "testified at length about her prior use of drugs, including methamphetamine, and the tattoos she received from her brother." He was of the opinion that "***additional*** evidence about a 'gangster lifestyle' would not have contradicted any of Tiffany's testimony nor impeached her testimony about accompanying Defendant to carry to carry out an armed burglary."  *Doc. 10-3* at 3 (emphasis added).   The bulk

---

[14]  A photo depicting the tattoo on her arm was entered into evidence the prior day was not described or at issue.

of the trial consisted of Tiffany's in-court testimony and a videotape of her lengthy statement to the police.  Though I would not assume or necessarily characterize drugs, and guns and tattoos as "gangster lifestyle" evidence, the trial judge correctly determined that the defense did not need the MySpace pages to make the points.

If after direct examination the jurors had the impression that Tiffany was implicating Petitioner simply because she was an innocent young girl prone to telling the truth,[15] they were quickly disabused of that notion during cross-examination.   In addition to the evidence the trial judge cited in his habeas findings, during the early minutes of cross-examination, defense counsel specifically asked about the entries on her MySpace pages, her brother Michael, and other items demonstrating a lifestyle that was far afield from an idyllic and innocent suburban life.  Through those exchanges, for example, the jurors learned that:

> • Tiffany's brother Michael lived with them "for a period of time" and she was "very close" to him, he was her "hero."  *Audiotape of Trial 2/5/08* at 9:29:10 – 9:29:34;

> • Tiffany "flirted with" and "liked" Petitioner the first time she met him, despite their age difference and his marital status; willingly slept with him on the first night her mother invited him over for dinner and made no attempt to cover up that fact when her mother discovered them the next morning.  Tiffany soon lived with him in her bedroom at her mother's home, where they continued their sexual relationship.  *Id.* at 9:36:47 – 9:42:00, 9:46:00 – 9:46-23;[16]

---

[15]  During her direct testimony, the prosecution introduced several post-arrest letters between Tiffany and Petitioner.  The jurors read them, quite thoroughly it appears, as they took more than an hour to do so.  *See Record Proper* at 293-94.  Respondents did not submit the letters and other trial exhibits for the federal record, so this Court cannot but guess whether Tiffany employed the same sort of language as reflected in her "MySpace" pages.  The snippets of the letters highlighted on cross-examination do not indicate one way or another.  In addition, the prosecution of Tiffany's separate criminal charges stemming from the incident were not fully resolved by the time she testified.  By the time of Petitioner's trial, defense counsel was able to elicit the possibility of favorable treatment in exchange for her testimony through his cross-examination, as discussed above.  *See, e.g., Audiotape of Trial 2/5/08* at 3:44:00 – 3:59:00.

[16]  The actual testimony is in stark distinction to the impression left by the courtroom deputy notes that Petitioner initiated sex with a reluctant Tiffany and overbore her protestations.  See *Record Proper* at 301.

• Tiffany was taken out of the juvenile detention to give the statement.   *Id.* at 9:39:34 – 9:40:35;

• Tiffany lied to the jurors when she initially insisted she was eighteen when she opened her MySpace account; although the prosecutor agreed by stipulation that she was not eighteen at the time and the jurors were so instructed, over the prosecutor's objection, the trial judge permitted defense counsel to use the pages to refresh Tiffany's recollection and impeach her. *Id.* at 9:31:00 – 9:37:30;

• Tiffany lied to the jurors when she initially testified that she was with Petitioner the "first time" she "did methamphetamine" and that she never told anyone that she took methamphetamine "with her friends." Her evasiveness on this point was apparent. For example, counsel successfully elicited Tiffany's claim that she could not remember her "testimony" from just a week earlier that she had "only heard about" methamphetamine "from friends," but had "never done it." This line of cross- examination then led to more believable testimony for a few minutes. *Id.* at 9:43:07 – 9:44:40;

• Tiffany voluntarily used multiple drugs as a young teenager. *Id.* at 9:44:40 – 9:45:59;

• Tiffany "handled" Petitioner's pistol on the first day she met him and he "never" used it to control or threaten her. *Id.* at 9:46:37 – 9:48:12; and

• Contrary to what she told the police during her interview, Tiffany could not "remember" distinguishing between Petitioner's two different rifles (one which was stowed in her closet and the other was used during the robbery). *Id.* at 9:48:45 – 9:49:15.

Because Tiffany had again begun to so obviously lie and become evasive, defense counsel was permitted, without objection, to play the videotape that contained Tiffany's more that three-hours statement to the police in the presence of her mother and father.[17]  The State did not submit the videotape for the habeas record, so the Court has not seen the DVD.  The audio

---

[17] *Audiotape of Trial 2/6/08* at 9:49:23 – 9:54:03.  Defense counsel did not play the portions of the tape containing the officer's "unsolicited" admonishment to Tiffany about the "bad" character of Petitioner and her brother Michael. *Id.* at 9:52:14 – 9:53:50.

portion of it is fairly distorted on the audiotape of the official record, and the persons present in the room at times speak simultaneously.  But, this interview is understandable for the most part with repeated playbacks with different tweaks to minimize distortion.  What is clear is the difference in the tone of Tiffany's testimony during trial compared to the videotape.  It is obvious that Tiffany was very friendly with the police, one of whom was flirtatious with her.[18] She was very cooperative and eager to please, and happy to paint Petitioner as a controlling and menacing Svengali as well as implicate him as the mastermind of the plan for the crime.

Also, through the videotape, the jurors learned that Tiffany was surrounded by adults who had no qualms about planning crimes including fraud and discussing the same in the presence of a girl in their care.  Specifically, the jurors heard that Tiffany's mother, brother Michael, and "Billy" did not like Petitioner because he was living in the house and having a sexual relationship with Tiffany.  An officer observed that, based on his understanding from "working the case" and prior conversations with others, he "knew" Tiffany's brother Michael was "involved" because he was present at conversations during the planning stages of the crime and was being recruited to take part.  So was Tiffany's mother.  *Id.* at 1:47:00 – 2:01:08.

Comments about Michael's involvement drew a rapid and vocal denial from Tiffany, who began to cry – the only time she did so during the entire interview.  The officer reminded her that she needed to worry about herself only – "Michael didn't make you do this" instead, Petitioner was the "kingpin" of the endeavor and she "needed to get herself out of this hole" – "Tiffany needs to help Tiffany" – and get back to college and getting on with her life and not

---

[18]  *See, e.g., id.* at 9:48:28 – 9:48:44 ("take that hand away from your face, you've got a beautiful smile"); *id.* at 11:21:26 – 11:21:38) ("are you feeling better now that you've got that off your chest . . . what's wrong . . . what are you thinking about, what's going through your mind . . . all of the sudden you just got quiet and pulled back in [officer laughing, Tiffany giggling] I can do that, um, um, . . . you got a pretty smile, don't want to cover it up").

worry about "covering for Michael, covering for Mom" who could have easily "stopped this

thing."  In further encouraging her, the officer said he "knew" Michael did not accompany

Petitioner into the house with Petitioner.  Tiffany later admitted to Michael knowing about the

crime that was to take place and being present when it was being discussed.  *Id.*

After recounting the details of the crime and how she and Petitioner came to be housed in

a motel, Tiffany called Michael to come fetch her.  *Id.* at 2:49:56 – 2:53:15.  The officer stopped

during this discussion to say:  "Let's stop right here because – the, the time frames – not quite

right, right here, OK?"  *Id.* at 2:53:19 – 2:53:15.  That was because "Michael was with you all

for quite a while inside Beall's when you were buying your clothes . . . even Michael was putting

clothes on the counter . . . he knew what just happened . . . and the money you all were spending

[was stolen]."  The officer was actually in the store watching them make the purchases, so he

would have known the time of day.  *Id.* at 2:53:42 – 2:57:00.

After the video interview concluded, defense counsel resumed cross-examination of

Tiffany, and several inaudible bench conference took place, one of which likely involved the

MySpace pages from the few phrases that can be heard, because counsel later directly questioned

Tiffany about Michael's involvement, which she again vehemently denied, and the precise

details of the problematic time line that the officer noted during her interview.  *See, e.g., id.* at

3:05:50 – 3:06:34, 3:17:30 – 3:19:30.  Among other things, counsel made these points:

> • It was "quite obvious" that Tiffany and her attorney talked to the
> prosecuting attorney before the interview with the officer, and that
> even though they made a show at the taped interview that she
> needed *Miranda* warnings and "no deal" had been reached, in the
> middle of the interview both Tiffany and her father started talking
> about "going home" and had every expectation that was going to
> happen after she gave her statement, which was precisely what
> happened.  *Id.* at– 3:o6:30 – 3:12:01;

• Tiffany experienced a change of heart from her expressions of devotion to Petitioner in letters following their arrest, when she learned that she was facing thirty-four years in jail under sentencing as an adult; soon thereafter she gave the interview to "protect herself" and "do anything" to keep herself out of jail and "cut herself a deal." *Id.* at 3:42:30 – 3:45:30;

• The "deal" was that she no longer faced the possibility of an adult multi-decade sentence, but she could still face juvenile penalties until she reached the age of twenty-one, with the obvious implication performing well during her testimony against Petitioner was in her best interest. *Id.* at 4:11:30 – 4:12:45;

• Tiffany and her mother were working for the victims and Tiffany knew where they kept the safe; she heard one of the victims saying they left money out, which was a theft hazard, and also propose to Tiffany's mother that they stage a theft and split the insurance proceeds; the proposal "upset" Tiffany's mother and they told Petitioner about it. *Id.* at 4:21:30 – 4:23:15;

• The victims also told Tiffany and her mother that they considered Petitioner "the Devil," which upset her mother also, and they relayed that comment to him. *Id.* at 4:23:06 – 4:24:50;

• Tiffany was present at one planning session for the crime at her house with Michael, who is "a lot smaller" than Petitioner; despite her father's urging her to tell the police about her mother, Michael and Patricio (Petitioner's brother), she was adamant that Michael, her "hero" and the one "she looks up to," was not present at the burglary. *Id.* at 4:26:30 – 4:29:30;

• The ammunition Tiffany bought thereafter at WalMart, while dressed in black, had nothing to do with these planning sessions, and if the jury believed her rendition of the story, then no one served as a getaway driver from the scene of the crime; instead, they left on foot in the "pitch black" in the dead of night without flashlights. *See, e.g., id.* at 4:30:00 – 4:33:02; 4:45-30 – 4:46:30;

• Petitioner planned to have his daughter on the night of the

burglary, but made no plans for babysitting during the planning sessions, so they just "left" her and fetched her later. *See, e.g., id.* at 4:34:30 – 4:36:30; 4:47:00 – 4:49:00;

• In less than twenty minutes after the crime, Petitioner left the scene of the crime, buried their proceeds, and walked several miles to their rendezvous spot. *Id.* at 4:45:00 – 4:47:00;

• Her brother, who she maintained was in Roswell, showed up after she called him with a roll of one-dollar bills, even though doing so violated the "terms of his release." *Id.* at 4:53:00 – 5:02:30.

On redirect, the prosecution elicited the fact that Tiffany's mother is in jail and that Tiffany stowed Petitioner's rifle in her bedroom closet. *Audiotape of Trial 2/t/08* at 9:15:00 – 9:17:30.

The Sixth Amendment Confrontation Clause provides that in "all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him" and applies to "defendants in state as well as in federal criminal proceedings." *Kentucky v. Stincer,* 482 U.S. 730, 735 (1987) (internal quotations and citations omitted); *see also, e.g., Pointer v. Texas,* 380 U.S. 400, 403 (1965). The guarantee "includes the right to conduct reasonable cross-examination." *Olden v. Kentucky,* 488 U.S. 227, 231 (1988) (citing *Davis v. Alaska,* 415 U.S. 308, 315-316 (1974)). However, the Confrontation Clause "guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v. Owens,* 484 U.S. 554, 559 (1988) (internal quotations and citations omitted).

"The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system." *United States v. Nobles,* 422 U.S. 225, 241

(1975).  The defendant must "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  *Chambers v. Mississippi,* 410 U.S. 284, 302 (1973).  In other words, a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."  *Taylor v. Illinois,* 484 U.S. 400, 410 (1988).  As such, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

Similarly, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense."  *Holmes v. South Carolina,* 547 U.S. 319, 324  (2006) (internal quotations and citations omitted).  The right to present a defense is not unfettered, either.  State and federal "rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and even if such rules completely prohibit the introduction of the guilt of a third party, they do not offend the constitution unless they are "arbitrary or disproportionate to the purposes they are designed to serve."  *Id.* (same).  As with the Confrontation Clause, the "constitutional right to present a complete defense is not abridged by the exclusion of 'evidence that is repetitive, only marginally relevant or [that] poses an undue risk of harassment, prejudice, or confusion of the issues.'"  *Aviles v. Archuletta,* 389 F. App'x 853, 858 (10th Cir. 2010) (quoting *Holmes,* 547 U.S. at 326-27).

-22-

Not allowing the introduction of cumulative character evidence is a constitutionally-legitimate basis upon which to exclude evidence. The exclusion does not violate the constitution where the defense establishes the information contained therein by other avenues. *See, e.g., United States v. Mullins,* 613 F.3d 1273, 1284 (10th Cir.) ("We think this limit was reasonable and safely within the 'wide latitude' the Confrontation Clause affords the district court. It didn't cut off all questioning on an important area of cross-examination, and it left the jury with substantial information about Mr. Wesson's leniency from the government. We do not think the 'jury might have received a significantly different impression' of his credibility had the challenged question been allowed. *Van Arsdall,* 475 U.S. at 680."), *cert. denied,* 131 S. Ct. 582 (2010); *Moore v. Marr,* 254 F.3d 1235, 1246 -1247 (10th Cir. 2001) ("At trial, the court sustained the prosecution's motion to disallow cross-examination of Goudie concerning a picture allegedly displaying drugs and drug paraphernalia. The prosecution successfully argued that while such evidence may have been relevant to Goudie's ability to perceive the events in question, it was not relevant for any other purposes, and thus its value was more prejudicial than probative."); *Collins v. Ray*, 184 F. App'x 750, 753-54 (10th Cir. 2006) ("Collins has failed to show how the evidence, if admitted, would have created a reasonable doubt not otherwise created by the permitted questioning . . . . Thus, questioning the witness about prior bad acts could further no legitimate purpose. The only added value of this questioning to Collins was as improper impeachment of the witness's character. Collins has failed to meet his burden of making a substantial showing of the denial of a constitutional right and we deny a COA on this issue.").

Except for the fact the Tiffany and her brother may have been "gang" members, counsel was able to make all of the salient points that the MySpace pages would have revealed: sporting

tattoos; familiarity with and lackadaisical attitude toward handling and stowing guns; cavalier attitude toward sex and Petitioner's marital status; family members who do not shy away from crimes and/or who are or have been incarcerated; and, unwavering devotion to her brother Michael. Furthermore, I am going to assume for the purposes of argument that Micheal is the man in the "couples' family photo" next to frequent MySpace entries by a woman. Those entries would simply show Tiffany periodically was in touch with Michael's wife before the crime. Tiffany's testimony was much more damaging, showing her involvement with Michael himself, both when he tattooed her and during with the planning sessions of the crime just before it occurred. Moreover, through the videotape, the defense offered evidence that an officer stated that he thought Michael was involved.

In summary, the defense theory of Michael's involvement was plainly before the jury, not only through Tiffany's own testimony, but the through that of Petitioner as well. Thus, disallowing the introduction of Tiffany's MySpace pages for the purpose of keeping "gang" character evidence from the jury did not offend the constitution. And, because there is no merit to the constitutional claims, there is likewise no merit to the ineffectiveness claims. *See e.g., Jones v. Gibson,* 206 F.3d 946, 959 (10th Cir. 2000).

In addition, even when a state proceeding does involve nonstructural trial-type errors of constitutional magnitude, a petitioner must hurdle the *Brecht* "harmless error" standard before habeas relief will issue. *See, e.g., Doc. 10* at 12, ¶ 19 ("Any error in the state district court criminal proceedings and the verdict reached by the jury was harmless. *Brecht v. Abrahamson,* 507 U.S. 619 (1993).").[19] Confrontation Clause errors and evidentiary rulings are among those

---

[19] *See also, e.g., Fry v. Pliler,* 551 U.S. 112, 117 (2007) ("The opinion in *Brecht* clearly assumed that the *Kotteakos* standard would apply in virtually all § 2254 cases. It suggested an exception only for the 'unusual case' in which 'a deliberate and especially egregious error of the trial type, or one that is

covered by this harmless error doctrine.  *See, e.g., Selsor v. Workman,* 644 F.3d 984, 1013 -

1014 (10th Cir. 2011)  (jury instruction error); *Welch v. Workman,* 639 F.3d 980 (10th Cir. 2011)

(en banc) (various evidentiary errors); *Stevens v. Ortiz,* 465 F.3d 1229 (10th Cir. 2006)

(confrontation error).  Also, the "prejudice prong of the *Strickland* ineffective assistance of

counsel test is "essentially" the same, so a separate inquiry is not necessary.  *See Byrd v.

Workman,* 645 F.3d 1159, 1167, n.9 (10th Cir. 2011) ("Had these two tests—that is, the

*Strickland* test and the *Brecht/McAninch* harmless-error test—applied different prejudice

standards, it is entirely possible that a two-level inquiry would be required, as Mr. Byrd seems to

suggest.  We agree with our sister circuits, however, that " *Strickland* prejudice and *Brecht*

harmless error are essentially the same standard," and that a second prejudice analysis under

*Brecht/McAninch* is therefore unnecessary when considering ineffective-assistance-of-counsel

claims.").

　　　　Here, even assuming error in nonadmission of the MySpace pages and constitutionally-

deficient counsel in connection with that ruling, having reviewed the entirety of the state

proceedings, I find that Petitioner cannot establish harmfulness.  Under the *Brecht* standard:

> Habeas relief is proper only if the error had a substantial and injurious effect or
> influence in determining the jury's verdict.  A substantial and injurious effect
> exists when the court holds at least a grave doubt about the effect of the error on
> the jury's verdict. Grave doubt exists when, in the judge's mind, the matter is so
> evenly balanced that he feels himself in virtual equipoise as to the harmlessness
> of the error.

---

combined with a pattern of prosecutorial misconduct, . . . infect[s] the integrity of the proceeding.'"); *id.*
at 121-22 ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of
constitutional error in a state-court criminal trial under the . . . standard set forth in *Brecht* . . . whether or
not the state appellate court recognized the error and reviewed it for harmlessness"); *Douglas,* 560 F.3d at
1171 ("unless the error is a structural defect in the trial that defies harmless-error analysis, we must apply
the harmless-error standard enunciated in *Brecht*) (internal quotations, citations, and alterations omitted).

*Szymanski v. Murphy,* ___ F. App'x ___, ___, No. 09-8096, 2011 WL 3677837 at *6 (Aug. 23, 2011).  In making that review, this Court must examine "the entire record to determine the error's possible effect on the jury" and consider factors such as the strength of the State's case, the importance of Tiffany's testimony to the prosecution and whether her testimony was cumulative, the extent of actual cross-examination undertaken by the defense, and the presence or absence of contradicting or corroborating evidence on the material points of her testimony. *Jones,* 206 F.3d at  959 (internal quotations and citations omitted).

      True, Tiffany's testimony was important to the prosecution's case because the burglars were masked and there were only two of them.  Defense counsel was given ample leeway in cross-examining Tiffany and, in doing so, made the very points that the MySpace pages would have illustrated but without the potentially inflammatory "gang" references.  The jury had to decide whether the duo consisted of Tiffany and Petitioner, or Tiffany and Michael, or some other combination.  The jurors were free to discredit, in whole or in part, Plaintiff's testimony.  It is clear that the jurors did not entirely believe Tiffany and carefully considered, not only her testimony, but also that of the victims in reaching their verdict.  The testimony of the victims alone provided the jurors with evidence that Petitioner and someone smaller committed the crime, and it did not matter whether the other person was Tiffany or Michael for the purpose of their decision concerning Petitioner's guilt.

      In my view, the introduction of the MySpace pages would not have affected the jury's sense of Tiffany's credibility any differently.  *See, e.g., Moore,* 254 F.3d at 1246 ("impeachment of Goudie on his drug usage would not have had a reasonable probability of changing the outcome of the trial . . . .   In weighing the potential harm of the alleged error, we

note that the trial court did not limit altogether Moore's ability to cross-examine Goudie on drug use.  In fact, the trial court allowed verbal cross-examination on Goudie's alleged drug use and even allowed Moore to testify as to whether Moore believed Goudie was under the influence of drugs.  The trial court exercised its "wide latitude" of discretion to prevent the admission of a line of questioning it reasonably assessed was more prejudicial than probative."); *Jones,* 206 F.3d at 957-59 ("Defense counsel carefully cross-examined Ms. Linker regarding the events occurring at the shooting.  The jury was able to observe her demeanor and assess her credibility with respect to her description of these events.  As the federal district court noted, defense counsel pointed out inconsistencies between petitioner's testimony at the preliminary hearing and her testimony at trial, and inconsistencies between her testimony and the testimony of other witnesses in an attempt to impeach her. . . .  Also, the jury had some impeachment evidence before it").

Wherefore,

**IT IS HEREBY RECOMMENDED AS FOLLOWS:**

1.  The § 2254 petition be denied;

2.  Petitioner's motion for appointment of counsel (Doc. 3) be denied;

3.  This action be dismissed with prejudice; and

4.  No certificate of appealability issue.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____

UNITED STATES CHIEF MAGISTRATE JUDGE